

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

January 18, 2017

<u>Via ECF</u>
Honorable Victor Marrero
United States District Judge
Southern District of New York
New York, New York 10007

      Re:    <u>United States</u> v. <u>Kun Shan Chun, a/k/a "Joey Chun</u>,"
            16 Cr. 518 (VM)

Dear Judge Marrero:

      The Government respectfully submits this letter in response to the defendant's January 13, 2017 sentencing submission ("Def. Mem."), and in connection with the upcoming sentencing of the defendant on January 20, 2017 at 3:00 p.m.

      As explained in the Government's Sentencing Memorandum ("Gov't Mem."), the defendant is a former FBI employee who betrayed the United States by acting at the direction of the Chinese government, harming national security in exchange for financial benefits, and concealing and lying about his actions for almost a decade. In connection with his admission of guilt, the defendant obtained a plea agreement in which he agreed that there is no applicable offense Guideline, and the appropriate range under the circumstances is 21 to 27 months. The plea agreement states explicitly that the parties' stipulated range accounts for the defendant's acceptance of responsibility; that benefit includes mitigating consideration for efficiencies arising from the timing of the defendant's plea, and is substantially outweighed by the gravity of the offense. Thus, a 27-month term of imprisonment and a $95,000 fine are appropriate in light of the seriousness of the crime, to achieve deterrence, to promote respect for the law, and to provide just punishment.

      In an effort to avoid a term of imprisonment altogether, however, the defendant inaccurately characterizes some of his criminal conduct as "innocuous," and falsely attributes much of the rest to a purported desire to "protect" his parents. By doing so, the defendant seeks to treat this sentencing proceeding like he did the FBI polygraph examinations, saying whatever best suits him to avoid accountability for his actions. The Court should reject the defendant's attempted justifications—his principal objective in compromising the FBI was enrichment, and that focus in no way mitigates the nature or extent of his crime.

Honorable Victor Marrero                                                                                              Page 2
January 18, 2017

## I. The Defendant Betrayed the United States and Harmed National Security

The defendant acted as an agent of the Chinese government while being employed by the FBI, and he provided sensitive FBI information to Chinese Official-1 over the course of several years. Following his arrest, the defendant acknowledged to the FBI that he had jeopardized the national security of the United States by doing so. Although the defendant now claims to have "no allegiance to China whatsoever" (Def. Mem. at 1), he stated at least twice during his confession that he believed his actions had helped the Chinese government.

The defendant's "behavior"—beginning in 2005 with outright lies to the FBI regarding his contacts with Chinese nationals—was *never* "innocuous," and his suggestion otherwise reflects a failure to fully accept responsibility for his conduct. (Def. Mem. at 1). The defendant was required to report his relationships with Chinese nationals to the FBI, and he was repeatedly warned by the FBI that the same type of relationships he was concealing were used by foreign governments in an effort to compromise United States government personnel. (*See* Gov't Mem. at 8 (describing some of the admonishments)). In the face of those warnings, the defendant's claim that he "saw nothing wrong with what he was doing" is not credible. (Def. Mem. at 2). In August 2015, the defendant conveyed to the UC his true state of mind regarding the FBI's requirements relating to contacts with foreign nationals: "You have to report" and his failure to do so was "[a]gainst company [*i.e.*, FBI] policy" as well as a crime. In the context of this case, jail time would be appropriate for the defendant's false statements alone. But his actions at the direction of Chinese Official-1 and his negotiations with the UC demonstrate the appropriateness of a 27-month term of imprisonment.

In arguing otherwise, the defendant's emphasis on his question to the UC regarding jeopardizing the "security of a country that I lived in" is misleading. (Def. Mem. at 10). He made that statement during a meeting on April 11, 2015, in the context of a discussion with the UC about whether the FBI was monitoring their phones. The defendant suggested that he did not believe they were being surveilled in that fashion because the FBI would not take that step unless the target was a "[b]ig time criminal." He then continued to explain why he thought they were not likely to be surveilled:

> <u>Unless whatever you do is really jeopardizing national security, you know?  But you're not, you know, you're not.</u>  So I mean, I wouldn't do anything like that.  Why why would I want to do something to jeopardize the the uh security of a country that I lived in all, that my family lived in.  You know what I'm saying?

Thus, when read in full, the defendant's comment suggests that he was simply trying to convince the UC and/or himself that they were beyond suspicion at that point in April 2015. By eliding the underlined sentence from the exchange, the defendant tries to suggest that he "was never going to assist the UC in . . . engaging in any other conduct [he] thought would harm the United States." (Def. Mem. at 10). The Court should not take the defendant's word for it, as the evidence is to the contrary. Just over two months after the April 2015 meeting, the defendant agreed to introduce the UC to his Chinese associates for the express purpose of facilitating the

Honorable Victor Marrero                                                                                                Page 3
January 18, 2017

sale of sensitive information under the auspices of a consulting (and sub-consulting) arrangement. The defendant then met with the UC in Europe in July 2015. There, he asked the UC if he wanted to work for the Chinese government, explained based on "firsthand" knowledge that the Chinese government was willing to provide financial and immigration benefits, and indicated that his Chinese associates would be interested in obtaining classified information from the UC. (*See* PSR ¶ 18). Such a transfer of classified information, which the defendant continued to negotiate into at least August 2015, would plainly have harmed the United States.

When describing some of the concrete harms that he caused to the FBI, the defendant places undue emphasis on his decision to remove the names of FBI personnel from the organizational chart that he provided to Chinese Official-1. (Def. Mem. at 2, 13). Providing information to a foreign government regarding the structure of the intelligence function of a United States agency is serious in and of itself. Moreover, the defendant's removal of the names from the organizational chart serves to highlight the harm resulting from his decision to disclose the actual name of an FBI Special Agent to Chinese Official-1. (PSR ¶ 8(a)). The defendant also makes no attempt to explain his possession of the sensitive FBI documents on the thumb drive that was seized from his basement after his arrest; those documents included, among other things, personal identifying information for 10 FBI employees. (*See* PSR ¶ 24(b)).

The episodic and seemingly "informal" nature of the defendant's interactions with Chinese Official-1 resulted from intelligence tradecraft and are therefore not mitigating. (*See* Def. Mem. at 13). They communicated only in person, and met only periodically, in an effort to avoid being surveilled and/or detained. The defendant demonstrated similarly heightened consciousness of electronic surveillance throughout his interactions with the UC. During the above-referenced meeting on April 11, 2015, the defendant confirmed that he had instructed his Chinese associates not to discuss "business" on the phone: "I told them that 'don't . . . don't . . . over the phone, don't say that,' you know?" During the same meeting with the UC, the defendant suggested that the UC buy multiple SIM cards in China so that he could "change to a different one" if "you think somebody monitoring you." Thus, the degree of care demonstrated in the handling of interactions between the defendant and his Chinese associates, including Chinese Official-1, reflects sophistication and consciousness of guilt that illustrate further the need for substantial punishment.

Finally, the defendant is wrong that his conduct "can hardly be considered a heartland § 951 violation." (Def. Mem. at 13). His misappropriation of sensitive FBI information in the United States in response to taskings from Chinese Official-1 falls squarely within the core prohibition of the statute. The legislative history of Section 951 "persuasively suggests that Congress chose to . . . treat [Section] 951 as a catch-all statute that would cover all conduct taken on behalf of a foreign government." *United States* v. *Duran*, 596 F.3d 1283, 1295 (11th Cir. 2010); *see also id.* at 1294 n.6 ("§ 951 is a broader, catch-all notification statute aimed at all foreign relations in general."). Indeed, Section 951 covers "*any* action of conduct by an

agent of a foreign government." *Id.* at 1295 n.7 (emphasis added).[1]  The defendant's compromise of the FBI, at the direction of Chinese Official-1, is among the most serious types of conduct prohibited by the statute. And it bears repeating that, in light of the extent of the defendant's lies, the Government cannot confidently assess the full scope of the intelligence breach that he caused.

## II.    The Defendant Was Motivated by Greed

The defendant is a 46-year-old man, living in a house worth approximately $650,000, who concealed illicit relationships with Chinese nationals for nearly a decade and provided sensitive FBI information to Chinese Official-1. The defendant nonetheless insists that he "loves the United States." (Def. Mem. at 1). More accurately, the defendant loved the financial rewards and other benefits that this country conferred upon him and his family. He made this very point to the UC in August 2015, explaining: "I love America but the only thing I like is you know what it is, everybody's about money."

In his sentencing submission, the defendant focuses on financial hardships that his family overcame long ago, and argues that his crime was motivated by "fear[]" for his parents and a desire to "protect" their investment in Kolion. (Def. Mem. at 1-2). In reality, however, there was no risk that the defendant's parents would lose their savings if the defendant declined to provide information to Chinese Official-1 or anyone else. In fact, the defendant admits that he "could, and did, refuse requests from the official." (*Id.* at 13).

The purported investment in Kolion by the defendant's parents was used, at least in part, as a mechanism for providing indirect payments in connection with efforts to cultivate a relationship with the defendant based on his position at the FBI and, later, in exchange for the assistance and information—including sensitive FBI information—that the defendant provided. The arrangement was initiated under suspicious circumstances. In April 2016, the defendant's mother admitted to the FBI that she was given an opportunity to "invest" in Kolion, with men she considered to be "business partners" and multi-millionaires (referred to in the Government's Sentencing Memorandum as CC-1 and CC-2), after helping a relative of another Chinese national obtain a visa in the United States under fraudulent pretenses.[2] She also told the FBI that she received monthly payments from Kolion, *irrespective of Kolion's performance*, which accrued in China and were paid to her in cash when she visited. She said she had been paid the

---

[1] The term "agent" includes individuals "subject to the direction" of a foreign official. 18 U.S.C. § 951(d); 28 C.F.R. § 73.1(a). The defendant admitted at his guilty plea that he "acted in the United States at the direction of" Chinese Official-1. (Aug. 1, 2016 Tr. 14).

[2] The defendant's parents were in China when he was arrested in March 2016, and the FBI interviewed each parent twice when they returned to the United States in April 2016. Each parent made a limited number of admissions during these interviews, which were scattered among numerous lies regarding, among other things, their finances.

Honorable Victor Marrero                                                                                                                Page 5
January 18, 2017

equivalent of between approximately $15,000 and $17,000 in renminbi ("RMB") during a recent trip to China, and claimed that she had spent all of the money before returning to the United States.

        The defendant's statements to the UC further belie the suggestion at sentencing that he felt compelled to violate Section 951 in order to "protect" his parents. Although the defendant now claims that he felt "great pressure" from his Chinese associates (Def. Mem. at 2), he described his meetings with the Chinese nationals as "very casual" and "way laid back" while preparing the UC to meet them in Europe. The defendant also asserts that Chinese Official-1 "made his expectations explicit" by directing the defendant, "'If you help me, I can help your mother.'" (Def. Mem. at 8). On its face, this alleged remark from Chinese Official-1 is, consistent with the other evidence of intelligence tradecraft, an offer of indirect compensation rather than a threat to anyone or their finances. In any event, the defendant also told the UC that Chinese Official-1 offered to pay him directly:

| | |
|---|---|
| Defendant: | He's, like, cause I didn't see him, uh . . . two or three years ago, he's, like, uh, "hey, you know, if you know, if you have that information, like, who's watching our people . . . ." |
| UC: | Yeah. |
| Defendant: | You know? |
| | Yeah. |
| Defendant: | **"If you have that information, you give me that information, I can pay you," you know? That type of deal, you know?** |
| UC: | Did he say how much? |
| Defendant: | No, that's it. |
| | *     *     * |
| Defendant: | Cause I don't want to deal with that, I don't want to, you know? Jinx myself right now, you know?[3] |
| UC: | Yeah. |
| Defendant: | That's like stealing, you know, that's all secret, you know? |

Notwithstanding these purported concerns about "stealing," the defendant disclosed to Chinese Official-1—at minimum—information regarding the FBI's personnel, structure, technological capabilities, general information regarding the FBI's surveillance strategies, and certain categories of surveillance targets.

---

[3] The defendant's reference to not wanting to "jinx himself" is another indication that he viewed the upcoming reinvestigation of his security clearance in 2016, including an anticipated polygraph, as only a temporary obstacle to providing further assistance to Chinese Official-1.

Honorable Victor Marrero                                                                                                      Page 6
January 18, 2017

        There is no evidence that the defendant engaged in that conduct at the direction of Chinese Official-1 based on concern that his parents were at risk. During his first recorded meeting with the UC, in March 2015, the defendant estimated that his parents' purported investment in Kolion had become worth approximately eight million RMB (the equivalent of just over $1 million), and said that Kolion "always" paid his mother "dividends and stuff like that." When the UC asked the defendant if his parents could divest ("get out") if they wanted, the defendant answered: "I think so, I think so, I think so, but they [*i.e.*, Kolion's managers] need us right now." The defendant explained that his parents' status as investors was critical to his Chinese associates because foreign investment enhanced Kolion's credibility within China:

> [T]hey need us too because the government won't give them a piece of land without . . . foreign contacts, foreign investment so they gotta use outsiders . . . America . . . Americans invested in this company so government . . . great, great, great . . . that type of deal, you know what I'm saying?

(*See* Def. Mem. at 7 ("[S]ecuring American investors was a boon that lent [Kolion] greater credibility in China.")). Thus, from the defendant's perspective—offered candidly to the UC in a meeting the defendant believed was secret—it was his parents who had leverage with Kolion because of their status in the United States.

        In April 2015, the defendant again indicated to the UC that he was not concerned about protecting his parents' investment, and he suggested that he just wanted to make "a lot of money":

| | |
|---|---|
| UC: | One . . . . you have to protect your parents' investment, you know, but . . . and two you gotta make sure that they…they make money. |
| Defendant: | **I mean, I don't really care. I mean, it's just that's my . . . my mother's thing, you know, she gonna take care of it**. . . . She just like watch over . . . . But my thing is like . . . if I'm gonna do something like you're saying [you're] gonna do something for them . . . then they have to pay me** . . . you know? |
| UC: | Yeah! |
| Defendant: | **They have to pay me** . . . . **they have to pay me a lot of money**. |

Thus, statements by the defendant and his mother regarding the nature of their relationship with Kolion demonstrate the lack of concern that "'his parents' hard earned saving[s]'" were going to "'vanish.'" (Def. Mem. at 6 (quoting letter from defendant's parents)). Rather, the defendant was focused on collecting perks and other benefits by peddling FBI information, and to the extent he demonstrated "filial piety," he did so by trying to enrich his parents during the process. Accordingly, the defendant was not simply a "loyal, if misguided, son out to protect his beloved parents." (Def. Mem. at 1). He was an opportunist looking to make more money by providing assistance to his Chinese associates and the Chinese government.

Honorable Victor Marrero                                                                                                                Page 7
January 18, 2017

### III.   The Defendant's Negotiations with the UC Were Highly Incriminating

The defendant seeks to avoid the highly incriminating nature of his interactions with the UC by calling the UC "pushy" and characterizing his statements as "bluster[]." (Def. Mem. at 8-9). The evidence refutes these arguments.

Beginning with their first recorded meeting in March 2015, the defendant spoke with the UC about acting as a consultant in an effort to insulate himself from the illegal exchange of information and receipt of payments directly from Chinese nationals:

| Defendant: | Maybe I can . . . . |
|---|---|
| UC: | Yep. |
| Defendant: | I don't have to deal with China, you'll deal with China. |
| UC: | Oh yeah, so you want . . . partner up? |
| Defendant: | Yea, I'll be your . . . consultant, you know?  And you'll just deal with China. |
| UC: | Yeah. |
| Defendant: | Because I can't, you know? |

The defendant continued to try to insulate himself from direct exposure later in the meeting, telling the UC:  "I could let them know that you're [a] consultant" and to "pay you, you know?  Just go there, they pay you, you know?"

In April 2015, the defendant volunteered to the UC that he was going to meet his Chinese associates in Europe.  He was not "pushed" to provide that information, and he agreed to introduce the UC to at least one of these associates.  In June 2015, the defendant met with the UC to prepare to make the introduction, and he repeatedly emphasized the need to discuss compensation at the meeting:

| Defendant: | Just be ready to answer questions, like, like, like . . . . [*In Chinese*: "Hey what's your experience?  What can you help us accomplish?"] |
|---|---|
| | *        *        * |
| Defendant: | And, uh, just be . . . be more, uh, direct, it's better to be more direct than . . . |
| UC: | Yeah. |
| Defendant: | [*In Chinese*: So I can help introduce you to someone, but ask about payment.  There must be payment.] |
| UC: | [*In Chinese*: Of course.] |
| Defendant: | You have to tell them, you know? |
| UC: | Yeah, yeah, yeah. |
| Defendant: | [*In Chinese*: There is a payment. Like, "I know I can help you with this matter, but I must get paid.  Must get it."] |
| UC: | Yup. |

> Defendant: [*In Chinese*: "If [you] want to use me, there must be payment."]

The defendant explained later in the meeting that his Chinese associates would "pay in cash" because "wire transfers leave [a] paper trail . . . from China to U.S." It is difficult to reconcile these recorded statements with the defendant's claim at sentencing that he was "not interested in payment." (Def. Mem. at 9). The evidence suggests that the defendant simply wanted to avoid being paid directly by Chinese nationals, as he feared that would place him at greater risk, and he hoped the UC would serve as an intermediary.

The planned meeting between the defendant, his Chinese associates, and the UC "never occurred" because the defendant's Chinese associates declined the introduction despite the defendant's efforts. (Def. Mem. at 9). The defendant said as much to the UC, on tape, and explained that the Chinese nationals had warned him that the UC may be part of a "trap." The defendant nevertheless met with the UC alone in Europe, and discussed brokering a sale of information from another agency of the United States government. (*See* PSR ¶ 18). When the UC said he expected a minimum of $50,000 in such a transaction, the defendant said that he would expect a "cut" of the payment if he arranged the deal.

### IV. Deterrence is a Critical Feature of This Sentencing

The defendant's hollow justifications for his crime suggest that some degree of skepticism is appropriate with respect to his claim that he has already been "wholly deterred." (Def. Mem. at 13).[4] For example, although the defendant now bemoans the "loss of his FBI career" (*id.*), he told the UC on August 17, 2015: "I really don't care about, ok, they fire me."

Even if the Court determines that specific deterrence has been achieved, general deterrence remains a critical feature of the sentencing. The defense concedes that the United States "will continue to face these threats" from outside actors seeking to compromise United States agencies, their personnel, and their information. (Def. Mem. at 14). The Government respectfully submits that some measure of deterrence with respect to these outside actors can be achieved through public prosecutions, resulting in substantial sentences, which demonstrate that attempted intelligence penetrations have been disrupted and that such breaches are treated as serious criminal violations in the United States. In this way, foreign actors are put on notice that they, too, face severe penalties if caught and convicted in connection with their efforts to harm this country. But an even more important objective for general deterrence in a case like this is

---

[4] Even more dubious is the defendant's assertion that "anxiety and depression" "no doubt contributed to the offense." (Def. Mem. at 11). His treating psychiatrist makes no such claim, and in fact indicates that treatment has been directed at "help[ing] him to deal with his anxiety and acceptance to his current situation," *i.e.*, his arrest and conviction. (*Id.* Ex. C). There is also no support in the record for the defendant's suggestion that the Bureau of Prisons could not provide similar mental health counseling while the defendant serves a term of imprisonment. (*See* Def. Mem. at 14).

the incentives faced by United States government employees and contractors who, like the defendant, are supposed to protect sensitive information but may seek to leak it for their personal gain. (*See* Gov't Mem. Ex. B at 14 (Statement of James R. Clapper, Director of National Intelligence: "Insiders who disclose sensitive US Government information without authorization will remain a significant threat in 2016.")). Here as well, the defendant's candid admission that the prospect of termination was an insufficient deterrent, relative to the financial benefits he derived and stood to gain in the future, is telling. Thus, a significant term of incarceration is imperative in order to deter this type of conduct by others.

The "[e]vidence-based studies" referenced by the defendant do not suggest otherwise. (Def. Mem. at 14). For example, Daniel Nagin observed in the article cited by the defense that the weight of the evidence demonstrates that "increases in [sentence] severity deter crime." Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Justice 199, 201 (2013)). Indeed, one court recently surveyed contemporary deterrence research, including Nagin's work, and concluded that "the literature largely demonstrates that incarceration serves a general deterrent function." *United States* v. *Sandoval-Enrique*, 171 F. Supp. 3d 1190, 1204 (D.N.M. 2016) (citing *United States* v. *Courtney*, 76 F. Supp. 3d 1267, 1303-04 & n. 13 (D.N.M. 2014)). Thus, the need for general deterrence of conduct like the defendant's further supports the imposition of a 27-month term of imprisonment.

V.  **A $95,000 Fine Should Be Imposed**

In arguing that the defendant "plainly lacks sufficient funds to pay a fine," counsel ignores entirely the $264,873 maintained by the defendant in a Thrift Savings Plan. (Def. Mem. at 2 n.1; PSR at 13). These funds consist of FBI income, supplemented to some extent by matching contributions from the United States, that the defendant earned while engaged in a prolonged betrayal of the FBI, and while accepting unreported benefits from his Chinese associates. The defendant agreed in his plea agreement that the Guidelines recommend a fine of up to $95,000, and the Court should impose just such a penalty—especially in the absence of an applicable forfeiture provision—in order to ensure that the defendant does not profit from this offense. *See* 18 U.S.C. § 3572(a)(5).

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney

By: _____
                                        Emil J. Bove III
                                        Assistant United States Attorney
                                        (212) 637-2444

Cc:    Jonathan Marvinny
        (Via Email)